UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**JAMESTOWN S'KLALLAM TRIBE,**

    **Plaintiff,**

    v.

**ALEX M. AZAR, in his official capacity as Secretary, U.S. Department of Health & Human Services,** *et al.***,**

    **Defendants.**

Civil Action No. 19-2665 (JEB)

---

## MEMORANDUM OPINION

The Jamestown S'Klallam Tribe is a federally recognized Indian tribe that owns and operates the Jamestown Family Health Center in Sequim, Washington. It brought this suit to challenge the Indian Health Service's rejection of its reimbursement request related to that facility. What makes this Health Center unusual is that, while it offers care to both Indians and non-Indians, the latter make up the overwhelming majority — over 97% — of its patients. The Tribe's funding proposal to IHS claimed that the Indian Self-Determination and Education Assistance Act (ISDEAA), 25 U.S.C. § 5301 *et seq.*, entitled the Tribe to compensation for certain costs (including depreciation, interest, and maintenance) associated with the use of the <u>entire</u> facility. IHS disagreed, contending that it did not owe compensation for the proportion of those costs that are attributable to the facility's provision of services to non-Indians. Each party renews these arguments before this Court in Cross-Motions for Summary Judgment. As the Government Defendants' position is ultimately more persuasive, the Court will enter summary judgment in their favor.

1

I.     Background

    A.  Legal Background

Intended to promote tribal self-determination and self-governance, the ISDEAA authorizes Indian tribes and tribal organizations to administer certain federal programs that would otherwise be carried out directly by federal agencies. See 25 U.S.C. § 5321(a)(1). Eligible programs include healthcare services normally offered by the Indian Health Service, a component of the Department of Health and Human Services, under the Indian Health Care Improvement Act (IHCIA). See 25 U.S.C. § 1601 et seq. Title V of the ISDEAA requires IHS to enter into self-governance compacts and associated funding agreements with tribes who wish to take over administration of IHS programs, essentially treating the tribe as a government contractor. See 25 U.S.C. §§ 5384–85.

The ISDEAA makes three types of funding available to a tribe as part of a Title V compact and funding agreement. First, the tribe is entitled to the baseline 'Secretarial amount' for "direct program costs," 25 U.S.C. § 5388(c), which "shall not be less than the [federal agency] would have otherwise provided for the operation of the programs or portions thereof for the period covered by the contract." 25 U.S.C. § 5325(a)(1). Providing that amount as a floor "ensures that the tribes receive funding equal to what the government would have spent if it provided the services at issue itself." Seminole Tribe of Fla. v. Azar, 376 F. Supp. 3d 100, 104 (D.D.C. 2019). Second, IHS must offer funding to offset certain "contract support costs," which are the reasonable additional costs (such as administrative or overhead expenses) of operating the particular program. See 25 U.S.C. §§ 5325(a)(2)–(3), 5388(c). Third, and at issue in this case, section 105(*l*) of the ISDEAA requires IHS to enter into a "lease" of certain facilities from the tribe at the tribe's request. See 25 U.S.C. § 5324(*l*). Although the agency does not physically

occupy or take over the facility, it nonetheless must pay at least some amount of compensation as part of the lease agreement.  See id.; see also 25 C.F.R. §§ 900.69–74; Maniilaq Ass'n v. Burwell, 72 F. Supp. 3d 227, 237–40 (D.D.C. 2014) (Maniilaq I) (concluding that section 105(*l*) lease funds are available as part of a Title V compact and funding agreement).

To qualify for the section 105(*l*) mandatory lease and associated compensation, a facility must be owned or leased by the tribe and "used by the [tribe] for the administration and delivery of" services under the ISDEAA.  See 25 U.S.C. § 5324(*l*).  Under the statute, lease "compensation may include rent, depreciation[,] . . . principal and interest paid or accrued, operation and maintenance expenses, and such other reasonable expenses that the Secretary determines, by regulation, to be allowable."  Id. § 5324(*l*)(2).  Although the statute states only that compensation "may" include such items, applicable regulations further specify the "elements . . . included in the compensation for a lease."  25 C.F.R. § 900.70; see also id. § 900.74.

When it comes to the actual amount of compensation that must be paid to the tribe under a mandatory lease, however, the regulations are somewhat inscrutable.  As an earlier court in this district put it, "[D]rafting imprecisions" and "apparent textual contradictions" "pervade the regulations" and "frustrate the Court's search for a steady place to get its footing."  Maniilaq Ass'n v. Burwell, 170 F. Supp. 3d 243, 250–51 (D.D.C. 2016) (Maniilaq II).  Deriving some order from the chaos, the Maniilaq II court offered two principles drawn from section 105(*l*) and the implementing rules: IHS need not grant lease "compensation requests that [are] 'duplicative' [of funding already provided by the government] . . . or [are] not 'reasonable.'"  Id. at 255 (citing 25 C.F.R. § 900.70 and 25 U.S.C. § 5324(*l*)(2)).  It is the reasonableness upon which this case turns.

B. Factual Background

The Plaintiff Tribe involved here is the Jamestown S'Klallam Tribe, members of which live in the State of Washington. See ECF No. 1 (Complaint), ¶ 8; ECF No. 13-1 (Pl. SMF), ¶ 1. The Jamestown Family Health Center, which they operate, is a nearly 35,000 square-foot facility that provides healthcare to both Indians and non-Indians in the service area. See Pl. SMF, ¶ 2. The full operating budget of the Health Center is close to $18 million. See ECF No. 21-11 (2018 Tribe Report) at 17. The Tribe is a participant in the ISDEAA's Title V self-governance program and has a compact and funding agreement with IHS pertaining to the Health Center. See Pl. SMF, ¶ 2. It received nearly $1.6 million in Secretarial amount and contract-support-cost funding from IHS under those agreements in fiscal year 2018. See ECF No. 13-9 (Rejection Letter) at 2; ECF No. 21-12 (Tribe 2018 Funding); see also ECF No. 13-10 (Funding Agreement) at 11 ($1.4 million provided for FY 2015).

On August 30, 2018, the Tribe submitted a proposal to IHS seeking, for the first time, lease compensation for the Health Center for fiscal year 2018. See Pl. SMF, ¶ 4–5. It proposed an amount of $981,402 and requested that such compensation be incorporated into the existing funding agreement, as is appropriate under the ISDEAA. See id., ¶ 4; Maniilaq I, 72 F. Supp. 3d at 238. After some negotiations, the Tribe and IHS agreed that the lease-reimbursement "costs for the entire Health Center for FY 2018 totaled $514,826," not the nearly $1 million the Tribe initially requested. See Pl. SMF, ¶ 6; see also Rejection Letter at 3.

IHS, though, did not agree to pay that amount as lease compensation. Citing the "reasonableness requirement of sec[tion] 105(*l*)(2)," the agency explained that it had to consider the fact that only 460 of the Health Center's 17,000 registered patients — less than 3% — are Indians. See ECF No. 13-7 (Email from Michael Weaver) at 3; Rejection Letter at 2. Although

4

non-Indians are generally ineligible for services from IHS under the IHCIA, the Tribe treats them on a fee-for-service basis under paragraph 1680c(c)(2) of that Act, which authorizes tribes operating under an ISDEAA compact to do so if they determine that "the provision of such health services will not result in a denial or diminution of health services to eligible Indians." 25 U.S.C. §§ 1680c(c)(1)(B), (c)(2); see Pl. SMF, ¶ 3. IHS nonetheless believed that it could not and should not pay section 105(*l*) lease compensation for the entire Health Center when the Center is "far larger than necessary to serve" the eligible Indian population. See Weaver Email at 2.

The agency accordingly proposed to reduce the compensation by a *pro rata* amount based on comparing the total square footage of the facility with the square footage necessary to provide services to Indian beneficiaries. See id. at 3; Rejection Letter at 3. Using a "supportable space methodology" drawn from an agency manual pertaining to a different funding context, IHS concluded that the Tribe needed only 7,060 square feet to serve the eligible population of 460 individuals. See Rejection Letter at 3. Because that represented 20.4% of the Health Center's total square footage, the agency proposed paying only that percentage of the $514,826 in full recoverable costs, or $105,025. Id. IHS reduced that proposed amount by a further $38,703, which the parties had already agreed was duplicative of costs covered by other reimbursements, leading to total lease compensation of $66,322. See id.; Pl. SMF, ¶¶ 7–8.

The agency invited the Tribe to furnish additional information regarding use of the Health Center by non-beneficiaries to enable IHS to "more accurately identify the applicable funding level of the proposed lease." Weaver Email at 3. Plaintiff, however, "fundamental[ly] disagree[d]" with the agency's view of section 105(*l*). See ECF No. 13-2 (Pl. SJ Mot.) at 2. As the Tribe read the statute and implementing regulations, they require IHS to "fully fund the

reasonable [and non-duplicative] costs of operating and maintaining" the entire facility, regardless of whether it is used to serve non-Indians. Id. at 1.  The Tribe thus submitted a "final offer" to IHS proposing that the agency pay the full $476,123 — "the agreed-on operational costs of $514,826 less $38,703 for the [duplicative costs] offset." ECF No. 13-8 (Final Offer) at 3; see 25 U.S.C. § 5387(b).

IHS rejected that offer because it concluded under the ISDEAA that "the amount of funds proposed in the final offer . . . exceed[ed] the applicable funding level to which the Indian tribe is entitled" for the reasons described above. See 25 U.S.C. § 5387(c)(1)(A)(i).  The agency instead agreed to enter a lease and pay the $66,322 it thought appropriate. See Rejection Letter at 9; ECF No. 21-18 (Lease Agreement) at 2.  The Tribe then brought this action challenging IHS's rejection of its proposed amount of lease compensation. See Pl. SMF, ¶ 10.  Both the Tribe and the Government have filed Cross-Motions for Summary Judgment.

During summary-judgment briefing, Plaintiff submitted a Declaration signed by Diane Gange, the Tribe's CFO, as well as a one-page exhibit, both relating to the Health Center's accounting of revenues and expenses. See ECF No. 24-1 (Gange Declaration); ECF No. 24-2. In response, the Government filed a Motion under Rule 56(d) of the Federal Rules of Civil Procedure, requesting that this Court either permit discovery into the Tribe's accounting practices or strike the Gange Declaration and attached exhibit from the record. See ECF No. 28-1 (Defs. Rule 56(d) Motion) at 7.  The Government contends that the Tribe's accounting is relevant to whether its services to non-Indians are provided "'under' its funding agreement" such that those services are eligible for section 105(*l*) lease compensation. See id. at 4.  The Tribe responds by arguing that its accounting is not "necessary to the litigation," Convertino v. U.S. Dep't of Justice, 684 F.3d 93, 99 (D.C. Cir. 2012), and, in fact, the Tribe is willing to withdraw

the Gange Declaration if the Court believes that its presence in the record warrants further discovery.  See ECF No. 30 (Pl. Opp. to Rule 56(d) Motion) at 6–7.  As will become clear below, Plaintiff's accounting is not information necessary to resolve the pending Motions.  The Court will therefore disregard the Gange Declaration and attached exhibit and deny the Government's Rule 56(d) Motion as moot.

## II.     Legal Standard

Summary judgment is warranted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  When a motion for summary judgment is under consideration, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*).

Under the ISDEAA, when rejecting a tribe's final offer under the Title V self-governance program, the relevant agency must provide a "specific finding that clearly demonstrates, or that is supported by a controlling legal authority," that one of four enumerated grounds for rejection exists.  See 25 U.S.C. § 5387(c)(1)(A).  Here, IHS rejected the Tribe's offer for the enumerated reason that "the amount of funds proposed in the final offer exceed[ed] the applicable funding level to which the [Tribe] is entitled."  Id. § 5387(c)(1)(A)(i).  The agency purports to have supported that conclusion with "factual findings and controlling law."  ECF No. 21-1 (Defs. Opp.) at 15.

7

The standards of review applicable to the agency's factual findings and legal claims differ from the typical APA context. As to factual questions, the agency bears "the burden of demonstrating by clear and convincing evidence the validity of the grounds for rejecting the offer." 25 U.S.C. § 5387(d). As to legal questions, the Government concedes that the appropriate standard is *de novo* review. See Defs. Opp. at 12; see, e.g., Maniilaq II, 170 F. Supp. 3d at 247; Pyramid Lake Pauite Tribe v. Burwell, 70 F. Supp. 3d 534, 542 (D.D.C. 2014). In conducting that review, Title V of the ISDEAA requires that "[e]ach provision of th[at] [title] and each provision of a compact or funding agreement shall be liberally construed for the benefit of the Indian tribe[,] . . . and any ambiguity shall be resolved in favor of the Indian tribe." 25 U.S.C. § 5392(f). The agency's ISDEAA regulations state the same. See 25 C.F.R.§ 900.3(b)(11). These provisions codify the generally applicable "Indian law canon of statutory construction." Pyramid Lake Pauite Tribe, 70 F. Supp. 3d at 541–42; see, e.g., Chickasaw Nation v. United States, 534 U.S. 84, 93–94 (2001). While that canon must be given its due, like others, it "need not be conclusive," and "other circumstances evidencing congressional intent can overcome [its] force." Chickasaw Nation, 534 U.S. at 94 (quotation omitted); see also South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 506 & n.16 (1986) (citing cases to that effect).

### III. Analysis

The only question before the Court is whether the Tribe's final offer of $476,123 in section 105(*l*) lease compensation "exceed[ed] the applicable funding level to which the [Tribe] is entitled under" Title V. See 25 U.S.C. § 5387(c)(1)(A)(i). In its rejection letter, IHS made three arguments for why the answer was yes. First, providing full funding for the Health Center would be "contrary to the ISDEAA" because "while the IHCIA authorizes the [Tribe] to serve

8

ineligible individuals, it is clear that the provision of those services is not part of the IHS Programs transferred to the Tribe" and is therefore not eligible for section 105(*l*) funding. See Rejection Letter at 6. Second, even if that is wrong and services to non-beneficiaries are provided pursuant to the Tribe's funding agreement, supplying lease funds "for Health Center space that is not necessary or used to carry out services for IHS beneficiaries is unreasonable"; IHS thus need not do so. Id. Third, given IHS appropriations constraints, paying the full lease amount requested by the Tribe would "result in the diminution of health services to eligible Indians" elsewhere in the country, and the IHCIA prevents tribes from offering healthcare to non-beneficiaries if that is the case. Id. at 8.

       The Government presses only the first two arguments in its Motion here, and the Court need only address the second, which concerns the reasonableness of the Tribe's lease-compensation proposal. Under Maniilaq II, IHS may decline to pay such compensation if the proposed amount is "not reasonable." 170 F. Supp. 3d at 251. The Government argues that lease compensation based on the full allowable costs (interest, depreciation, etc.) of the near-35,000 square-foot Health Center would be unreasonably high when less than 3% of the population it treats is eligible for services under the IHCIA. The Court concurs and will therefore grant summary judgment to Defendants.

       IHS determined that only 20.4% of the Health Center facility was necessary to serve the Center's active-user population of Indian beneficiaries. It thus concluded that, in essence, nearly 80% of the Health Center is used to serve only non-Indian, non-IHS beneficiaries. Compensating the Tribe for allowable costs attributable to that 80% would be tantamount to paying it for the facilities costs of providing services exclusively to non-beneficiaries. That would not be a reasonable use of IHS's limited funds. Put briefly, section 105(*l*) lease

9

compensation is intended to reimburse tribes, as federal contractors are reimbursed, for the reasonable costs of carrying out services in the place of the government. Under the ISDEAA, the services that tribes are so authorized to perform are those for <u>Indian</u> beneficiaries. Section 105(*l*), therefore, is intended to reimburse tribes for the costs they incur providing <u>those</u> services, not to provide funds that underwrite services to non-beneficiaries.

Begin with the textual evidence, which strongly suggests that lease compensation is meant to give tribes a way of recovering costs they incur by taking over the operation of federal programs as quasi-federal contractors. Section 105(*l*)(2) speaks of "allowable" "expenses," language that typically refers to recoverable costs associated with performing a government contract. The examples the statute provides (depreciation, principal, interest paid or accrued, maintenance) fit that bill. <u>See</u> 25 U.S.C. § 5324(*l*)(2); <u>see also</u> <u>Maniilaq II</u>, 170 F. Supp. 3d at 254 n.6 (explaining that "designation of 'allowable costs' is one part of a process through which a government contractor is reimbursed for costs it incurs while performing on its contract") (citing Charles Tiefer & William A. Shook, <u>Government Contract Law</u> 179–80 (2d ed. 2004)). IHS's implementing regulations sing the same tune, helpfully clarifying that "the same type of costs" recoverable under a section 105(*l*) lease "may be recovered in whole or in part . . . as direct or indirect charges to a self-determination contract" — in other words, as Secretarial amount funds or contract-support funds. <u>See</u> 25 C.F.R. § 900.73; <u>see also</u> <u>Maniilaq II</u>, 170 F. Supp. 3d at 252 ("[S]ection 900.73 appears to designate section 105(*l*) leases and section 106(a) funding as equivalent methods of tribal cost recovery.").

The history of section 105(*l*) confirms this interpretation. As Judge John Bates of this district recounted in <u>Maniilaq II</u>, "The 1994 legislation that added section 105(*l*) to the [ISDEAA] was, in part, a reaction to regulations proposed by [HHS] earlier that year." 170 F.

10

Supp. 3d at 253 (citing S. Rep. 103-374 at 3). Those proposed regulations specified that "expenses associated with the use and depreciation" of tribally owned property "used in the performance of a self-determination contract shall be recovered in accordance with the cost principles" set out by OMB for state and local government contractors. See Indian Self-Determination and Education Act Amendments, 59 Fed. Reg. 3,166, 3,198 (proposed Jan. 20, 1994); see also id. at 3,170, 3,192 (referring to method of calculating "allowable costs" under applicable OMB circular). Tribes, though, felt that "cost principles issued by [OMB] . . . were not always appropriate for application to the transfer of governmental functions . . . to tribal governments," and they thus sought the "development of certain cost principles specific to self-determination contracts." Indian Self-Determination and Education Assistance Act: Oversight Hearing Before the Subcomm. on Native American Affairs of the House Comm. on Natural Resources, 103 Cong. 75–76 (1994) (statement of S. Bobo Dean, Esq.). Responding to that request, section 105(*l*)(2) delegated to IHS the authority to "determine, by regulation," exactly which "reasonable expenses" would be "allowable," 25 U.S.C. § 5324(*l*)(2), rather than leaving the recovery of use- and depreciation-related expenses to general government-contracting principles. Although the statute thus rejected the application of OMB's cost-recovery rules, Congress's intent was to reimburse tribes for "allowable costs" related to the performance of government programs — but as a special, rather than generic, kind of contractor. See Indian Self-Determination and Education Assistance Act Amendments, 61 Fed. Reg. 32482, 32490 (June 24, 1996) (regulations promulgated after section 105(*l*) was enacted).

Because section 105(*l*) funds are meant to compensate a tribe for the indirect costs of administering a federal program, it is not reasonable to use such funds to underwrite the provision of services to non-Indians for a simple reason: tribes cannot contract with the

government under ISDEAA to perform such services. To be eligible to be performed by a tribe under a Title V self-governance compact, a federal program must be "carried out for the benefit of Indians because of their status as Indians," or be a program "with respect to which Indian tribes or Indians are primary or significant beneficiaries." 25 U.S.C. § 5385(b)(1)–(2); see also id. § 5321(a)(1) (same essential requirements for Title I self-determination contracts). Services to non-beneficiaries do not qualify — unsurprisingly, given that the purpose of the ISDEAA is to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services." Id. § 5302(b). In short, since the Tribe cannot contract with IHS or any other agency to take over a healthcare program that serves only non-Indians, it should not have access to section 105(*l*) funds to support facilities used to provide those services.

Consider this analysis from another angle, involving the Secretarial amount of funding that the Tribe receives from IHS. This amount, by way of reminder, is for "direct program costs," id. § 5388(c), and "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the program" being taken over by the tribe. See id. § 5325(a)(1). Plaintiff appears to have received about $1 million in Secretarial-amount funds for the IHCIA programs administered at the Health Center in FY 2018. See Rejection Letter at 2 ($1.6 million in total funding); Funding Agreement at 2–3 (listing programs provided at Health Center; noting dental care provided at different facility); Tribe 2018 Funding (showing roughly $600,000 paid in contract-support costs, roughly $27,500 in dental funding). The full operating budget for the Health Center, though, is just shy of $18 million. See Rejection Letter at 2, 6 (claiming Health Center has an operating budget of $18 million but neglecting to note this amount includes other

smaller enterprises); 2018 Tribe Report at 17 (reporting "budget of approximately $18 million" for Health Center, dental clinic, and other programs). From these numbers, it is fair to infer that the Health Center operates a program at least ten times larger than the program IHS would otherwise be operating on behalf of Indian beneficiaries in the absence of an ISDEAA compact. Cf. Rejection Letter at 7 ("The [Tribe] seeks to force the IHS to pay 100 percent of the Health Center's operational costs when the funds transferred for IHS Programs are only around 9 percent of the Health Center's operational budget."). Bear in mind, moreover, that the raw number of Indian patients served is 460 out of over 17,000. It would be unreasonable for section 105(*l*) lease compensation to ignore these basic facts.

The Tribe sees things differently. While it might not dispute much of the above analysis, it contends that paragraph 1680c(c)(2) of the IHCIA (not, to be clear, of the ISDEAA) changes everything. Recall that section 1680c authorizes IHS — and, pursuant to an ISDEAA self-governance compact, a tribe — to provide services to non-Indians so long as the relevant entity determines that "the provision of such health services will not result in a denial or diminution of health services to eligible Indians." 25 U.S.C. §§ 1680c(c)(1)(B), (c)(2). The Tribe has made such a determination here, see Pl. SMF, ¶ 3, and it points out that under paragraph 1680c(c)(2), "[a]ny services [it] provide[s] . . . pursuant to [that] determination . . . shall be deemed to be provided under the agreement entered into by the Indian tribe or tribal organization under the [ISDEAA]." 25 U.S.C. § 1680c(c)(2). Per the terms of the IHCIA, then, Plaintiffs' services to non-beneficiaries at the Health Center are, as a matter of law, provided "under" its ISDEAA self-governance compact. The Tribe then argues, squeezing all it can out of the shared preposition "under," that its services to non-beneficiaries must qualify under section 105(*l*)(2) of the ISDEAA as "use[] by the [Tribe] for the administration and delivery of services under th[at]

13

chapter." 25 U.S.C. § 5234(*l*)(1) (emphasis added). Plaintiffs thus contend that the above deeming clause entitles "the entire Health Center facility," not merely the 20% necessary to serve Indian beneficiaries, to receive full section 105(*l*) funding. Pl. SJ Mot. at 21.

That highly literal reading of the two statutes at issue, while superficially appealing, cannot be accepted because it would lead to absurd results. See U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 455 (1993) ("[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.") (citing cases); cf. Connecticut v. United States Dep't of the Interior, 344 F. Supp. 3d 279, 311–12 (D.D.C. 2018) ("[T]he Court cannot give effect to a statute's literal meaning when doing so would . . . 'create[ ] an outcome so contrary to perceived social values that Congress could not have intended it.'") (quoting United States v. Cook, 594 F.3d 883, 891 (D.C. Cir. 2010)). Under the Tribe's theory, no matter how large a "facility used by [a tribe] for the administration and delivery of services under" the ISDEAA is, and no matter how few eligible Indians are served by that facility, IHS is on the hook for lease compensation for the entire facility. For example, a tribe could operate a health clinic that serves a population of five Indians and 50,000 non-Indians, yet receive the same section 105(*l*) funding as a tribal facility that serves 50,005 eligible Indians, even though the tribe would be eligible for no ISDEAA funding at all if not for the five eligible Indians it served. Along similar lines, Plaintiff here could add multiple new wings to the Health Center, entirely aimed at expanding capacity to serve non-beneficiaries, and recoup additional section 105(*l*) funds after that expansion, as it would remain the same "facility" or "building." 25 C.F.R. § 900.69. It would plainly not be "reasonable" to provide such funding under a section 105(*l*) lease, yet IHS would have no choice

14

but to do so under the Tribe's interpretation. The Court cannot read section 1680c's deeming clause to compel that reading of section 105(*l*) of the ISDEAA.

Plaintiffs' interpretation also makes little sense of section 1680c itself. Although that section authorizes services to non-beneficiaries, it also requires tribes to recoup from non-Indian patients or their insurers an "amount not less than the actual cost of providing the health services." 25 U.S.C. § 1680c(c)(3)(A). Recent Congressional appropriations to IHS contain a similar proviso. See Consolidated Appropriations Act, 2018, Pub. Law No. 115-141, 132 Stat. 348, 679 (Mar. 23, 2018); Consolidated Appropriations Act, 2019, Pub. L. 116-6, 133 Stat. 13, 250 (Feb. 15, 2019). It would be odd for Congress to have instructed IHS to compensate tribes for facilities costs associated with providing services to non-Indians when the legislature also required that tribes be paid "reimbursement in an amount not less than the actual cost of providing [such] health services." Id. at 1680c(c)(3); see also ECF No. 13-4 (Tribe Resolution) at 2 (Tribe provides healthcare "on a fee-for-service basis" to non-beneficiaries, as a typical freestanding healthcare enterprise would).

The Tribe counters that its fee-for-service charges do not recoup enough from non-Indians to cover facilities costs, see ECF No. 24 (Pl. Reply) at 14, but that does not mean that Congress intended such shortfalls to occur, let alone that section 105(*l*) lease funding would fill the gap. Presumably, Congress thought that the "actual cost" of providing services to non-beneficiaries would include facilities costs and other indirect costs; if it did not, then tribes would provide those services at an overall loss, eventually causing "the provision of such health services [to] result in . . . [the] diminution of health services to eligible Indians," at cross-purposes with one of the IHCIA's core commands. See 25 U.S.C. § 1680c(c)(1)(B). At any rate, even if a tribe might permissibly elect to provide services to non-beneficiaries at a loss —

15

perhaps, for example, as an investment enabling it to build a better health facility and hire better doctors — there is no reason to think section 105(*l*) funding is meant to address that circumstance, nor any indication that the Health Center serves over 97% non-beneficiaries for that purpose.

The Tribe's (citationless) assertion that Congress enacted 1680c's deeming clause to help "tribes . . . generate additional revenues," Pl. Reply at 12, does not advance the ball. The deeming clause was, as the Tribe suggests, an attempt to provide certain incidental benefits to tribes providing services as part of an ISDEAA compact to non-Indians, such as liability coverage under the Federal Tort Claims Act. See 25 U.S.C. § 5321(d); see also id. § 5396(a). But there is no suggestion from the statutory text or the legislative history that anyone thought that one of those benefits would be entitlement to full, on-demand lease compensation for a large facility that serves overwhelmingly non-Indian, non-IHCIA beneficiaries. Indeed, the Tribe has not cited a single instance before this one in which any Indian tribe or tribal organization has sought that level of compensation from IHS since the deeming clause's enactment a decade ago.

Pivoting, the Tribe next argues that the question of "reasonableness" is a red herring because Maniilaq II was wrong, and IHS is not allowed to reject a final lease offer merely because the proposed level of compensation is "not reasonable." See Pl. SJ Mot. at 22–23. Instead, according to the Tribe, section 105(*l*) only gives IHS the power to determine what costs are reasonable or unreasonable via promulgated regulations. See 25 U.S.C. § 5324(l)(2) ("Such compensation may include rent, depreciation . . . [etc.] and such other reasonable expenses that the Secretary determines, by regulation, to be allowable.") (emphasis added). Since the current lease-compensation regulations say nothing about services to non-beneficiaries, the Tribe argues,

IHS cannot deny lease compensation related to those services simply by claiming that it would be unreasonable.

Judge Bates, however, was correct that section 105(*l*)(2) entitles tribes only to reasonable amounts of lease compensation. As he stated in Maniilaq II, the statute "tether[s] the concept of compensation to . . . 'reasonable expenses.'" 170 F. Supp. 3d at 250. After providing examples of what lease compensation may include, such as rent, depreciation, and maintenance costs, the statute then authorizes IHS to reimburse "other reasonable expenses," suggesting that the listed examples are also intended to provide "reasonable" compensation benchmarks. See 25 U.S.C. § 5324(*l*)(2) (emphasis added). The Court, therefore, cannot accept the notion that section 105(*l*) compels the agency to pay an unreasonable amount of lease compensation unless it can identify an on-point regulation in which it previously codified its judgment that such compensation is not recoverable. Doing so would push the Indian law canon past its breaking point.

The Tribe last takes issue with the agency's use of the "supportable space methodology," drawn from an agency handbook that governs the allocation of facilities' maintenance funds, to approximate the amount of the Health Center that would be necessary to serve only ICHIA beneficiaries. See Pl. SJ Mot. at 19; Pl. Reply at 8. Specifically, the Tribe points out that under 25 U.S.C. § 5397(e), it "shall not be subject to any agency circular, policy, manual, guidance, or rule adopted by" by IHS except via its consent. Plaintiff, though, has not been made "subject to" the supportable-space methodology in the relevant sense. The agency used that methodology to propose an initial estimate of the proportion of the Health Center facility necessary to support the 460 eligible Indians in its service population. See Weaver Email at 3; Rejection Letter at 3. It "invited the [Tribe] to furnish additional information regarding use of the Health Center by ineligible individuals so that alternative approaches could be considered." Rejection Letter at 3;

see also Weaver Letter at 3 ("IHS requests that the Tribe provide . . . . information [that] will enable IHS to more accurately identify the offset of costs attributable to use by non-beneficiaries."). The Tribe, objecting to the premise of that invitation, did not do so. See Rejection Letter at 3. In any event, at this stage it can hardly complain that the supportable-space methodology was at all stingy: it concluded that 20% of the Health Center was necessary to serve less than 3% of the Center's patient population. The Tribe does not contend that a greater proportion of the Health Center is used to serve beneficiaries.

In sum, the Government has demonstrated that the Tribe's proposal for section 105(*l*) lease compensation based on the costs of the entire Health Center "exceed[ed] the applicable funding level to which the Indian tribe is entitled," 25 U.S.C. § 5387(c)(1)(A)(i), because the Tribe is not entitled to an unreasonable amount of lease compensation. Were the Plaintiff's view accepted, IHS would be obligated to provide compensation for the full recoverable costs of any tribal facility that serves just one Indian beneficiary, simply upon request. Such a use of the limited funds appropriated to IHS by Congress would not comply with the requirement that lease compensation be "reasonable," and the agency was therefore clearly correct to reject the Tribe's proposal.

## IV. Conclusion

For the foregoing reasons, the Court will enter summary judgment for the Government Defendants. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: September 11, 2020